IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| BRILLIENT CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:24-cv-1205 (RDA/WBP) |
| ) | |
| RELI GROUP, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant RELI Group, Inc.'s ("RELI" or "Defendant") Motion to Dismiss for Failure to State a Claim (Dkt. 15). This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Having considered the Motion together with Defendant's Memorandum in Support (Dkt. 16), Plaintiff Brillient Corporation's ("Brillient" or "Plaintiff") Opposition (Dkt. 18), and Defendant's Reply (Dkt. 19), this Court GRANTS-IN-PART and DENIES-IN-PART the Motion to Dismiss for the reasons that follow.

I. BACKGROUND

A. Factual Background[1]

Plaintiff Brillient brings a two-count Complaint against Defendant RELI, alleging that (1) Defendant tortiously interfered with non-solicitation agreements that Plaintiff had with its

---

[1] For purposes of considering Defendant's Motion to Dismiss, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

former employees who are now employed by Defendant and (2) Defendant was unjustly enriched when it poached twenty of Plaintiff's employees.  Dkt. 1 ¶ 1.

Plaintiff, a Virginia corporation, provides information technology-based services to federal and state governments.  *Id.* ¶¶ 4, 9.  Plaintiff has serviced many government agencies, including the Department of Homeland Security ("DHS") and the Transportation Security Administration ("TSA").  *Id.* ¶ 9.  Defendant, an 8(a) Small Business located in Maryland, supports prime contracts at federal agencies, including the TSA.  *Id.* ¶¶ 5, 10.

On December 22, 2017, Plaintiff and Defendant entered into a teaming agreement to jointly pursue a services contract with the TSA.  *Id.* ¶ 11.  Given Defendant's small size award eligibility and lack of prior experience with the TSA, Plaintiff brought the TSA opportunity to Defendant.  *Id.*  On May 10, 2019, the TSA awarded Defendant the "Program Management, Support Services (PMSS)" prime contract (the "TSA PMSS Project"), a 5-year single award blanket purchase agreement ("BPA") funded by the TSA with a potential value of $111 million at the time of award.  *Id.* ¶ 12.  As of June 2024, Defendant had received, or the TSA had obligated, over $286 million as the prime contractor on the TSA PMSS Project.  *Id.*

After being awarded the prime contract, Defendant entered into a subcontract with Plaintiff – Subcontract Agreement No. SA-2019-00031A (the "Subcontract").  *Id.* ¶ 13.  Referencing Defendant's prime contract with the TSA, the Subcontract specified that Plaintiff was "selected to provide the professional services herein in support of [Defendant]'s efforts under the Prime Contract because of the skills and qualifications Subcontractor [Plaintiff] possesses."  *Id.*; *see also* Dkt. 10 at 1 ("Subcontract Agreement").  Plaintiff's services on the TSA PMSS Project under the Subcontract were provided under various Task Orders and included:

- General Program/Project Management Support
- Acquisition Program Management Support

2

- Systems Engineering Life Cyle (SELC) Support
- Financial Management and Cost Estimating Support
- Internal and External Reporting Support
- Strategic Planning and Business Process Analysis/Re-Engineering Support
- Acquisition Training Support
- Acquisition Workforce (AWF) Management Support
- Knowledge Management Support
- Administrative Support/Technical Editing Support
- Special Studies Support
- Incoming/Outgoing Transition (BPA)

Dkt. 1 ¶ 15.

The Subcontract contains multiple relevant provisions. Section 17(c) provides that Defendant "reserves the right to terminate this Agreement or any Task Order if [Defendant] determines that [Plaintiff] failed to disclose a conflict of interest." Dkt. 10 § 17(c). Section 2(d) grants Defendant the discretion to extend or decline to extend the term of Task Orders that include option periods. *Id.* § 2(d) ("If a Task Order issued and accepted under this Agreement includes option periods, then [Defendant] *may* extend the term of such Task Order" (emphasis added)). Section 19(a) permits Defendant to terminate the Subcontract or any Task Order for Defendant's convenience with thirty days' written notice, provided that Defendant "first document any concerns with [Plaintiff] and the parties [] engage in good faith efforts to resolve such concerns within a reasonable period of time." *Id.* § 19(a). Finally, Section 31 prohibits both parties from actively recruiting or soliciting current employees or consultants of the other party without that party's prior written consent. Dkt. 10 § 31. That provision further provides, however, that:

> This restriction shall not preclude either Party from hiring, as an employee or consultant, any person, regardless of any relationship between that person and the other Party, who, acting independently and on their own initiative, responds to a public notice or advertisement of any employment opportunity.

*Id.*

3

As part of Plaintiff's services for the TSA PMSS Project, Plaintiff expended significant effort and expense in "identifying, sourcing, recruiting, and hiring and training multiple employees for" various positions. Dkt. 1 ¶ 17. Moreover, Plaintiff helped to ensure that all its personnel had appropriate access badging credentials and security clearances to perform work on the TSA PMSS Project – a process that can take 4-6 months to obtain and "during which Plaintiff spent time and effort keeping these candidates engaged prior to their hire date." *Id.* ¶ 18.

Individuals who Plaintiff employed and staffed on the TSA PMSS Project entered into a "Brilliant Non-Solicitation Agreement" with Plaintiff (the "Employee Non-Solicitation Agreement(s)"). *Id.* ¶ 19. Article 2(c) of the Employee Non-Solicitation Agreements provides that an individual employed by Plaintiff

> specifically agrees that during Employee's employment with the Employer and for a period of one year after Employee's employment with the Employer ceases, for whatever reason, the Employee will not, directly or indirectly . . . solicit or provide services to, or sell products to any Business Account of the Company that the Company provided services or products at any time during the six months prior to the termination of Employee's employment.

*Id.* ¶ 21; *see also* Dkt. 1-1 at 3, Art. 2(c). Article 2(b) of the Employee Non-Solicitation Agreement defines a "Business Account" as any:

> (i) business, client or government customer serviced by the Employer in which the Employee personally participated during the twelve (12) months immediately preceding the date of termination of the Employee, or (ii) any business, client or government to which a formal or informal presentation or solicitation was made by any agent or employee of the Employer in which the Employee personally participated during the twelve (12) month period immediately preceding the date of termination of the Employee, regardless of whether the business, account, or client was obtained by the Employer prior to the date of termination of the Employee.

Dkt. 1 ¶ 22; *see also* Dkt. 1-1 at 2-3, Art. 2(b).

Since the Subcontract's start in 2019, Plaintiff's work pursuant to the Subcontract has been under multiple Task Orders, including, *inter alia*, ESVP (TO 05), VAD (TO 04), Aviation Policy

4

Review (TO 01), ITMSS (TO 10), and PEO II (TO 13) (collectively, the "Five Task Orders"). *Id.* ¶¶ 23-24. As of early June 2024, Plaintiff staffed approximately 31 employees to perform services on the Five Task Orders. *Id.* ¶ 25. The Subcontract originally provided that "[Defendant] will allocate to [Plaintiff] a minimum of thirty (30%) of workshare" on the TSA PMSS Project. *Id.* ¶ 26. As such, at one time, Plaintiff staffed approximately 54 employees on the TSA PMSS Project. *Id.*

During the first option period of the Subcontract, however, Plaintiff observed Defendant improperly removing or "backfilling" positions designated for Plaintiff's employees on the TSA PMSS Project. *Id.* ¶ 27. Defendant's conduct resulted in a workshare dispute with Plaintiff, with Defendant threatening to terminate the Subcontract in November 2021. *Id.* In responding to the termination threat on December 2, 2021, Plaintiff notified Defendant, through counsel, that Plaintiff's "employees working on the TSA PMSS project had restrictive covenant agreements which [Plaintiff] would hold [Defendant] responsible for tortiously interfering with." *Id.* ¶ 28. The parties ultimately resolved the workshare dispute in February 2022 with an amendment to the Subcontract that addressed Plaintiff's concerns about Defendant removing or backfilling certain positions. *Id.* ¶ 29. Yet, Defendant continued to close and remove positions allocated to Plaintiff through 2022 and 2023. *Id.* ¶ 31-32 (alleging that from July 2021 to December 2023, Defendant removed and took back at least twenty-five (25) positions staffed by Plaintiff).

In late May and early June 2024, Defendant abruptly terminated the Five Task Orders on the TSA PMSS Project. *Id.* ¶ 37. On May 29, 2024, Defendant emailed Plaintiff, stating that it "[did] not intend to exercise Option Year 4 of either the ESVP (05) or VAD (04) task orders" and as a result, "[Plaintiff]'s support of those task orders will conclude at the end of Option Year 3 on June 16, 2024." *Id.* ¶ 38; Dkt. 1-4 at 2. On June 3, 2024, Defendant emailed Plaintiff again,

notifying Plaintiff of its "decision to terminate the Aviation Policy Review (TO 01), IT MSS (TO 5 [sic]), and PEO II (TO 13) task orders for convenience effective July 3, 2024." Dkt. 1 ¶ 39; Dkt. 1-5 at 2. Defendant had raised no substantive concerns or issues with Plaintiff regarding Plaintiff's performance under the Five Task Orders in the termination notices or prior to sending them to Plaintiff. Dkt. 1 ¶¶ 40-41.

On June 3, 2024, Plaintiff sent correspondence to Defendant, noting that Defendant had not complied with its obligation to engage in good faith negotiations pursuant to Section 19(a) of the Subcontract. *Id.* ¶ 42. Specifically, Plaintiff asserted that Defendant had not "document[ed] any concerns with [Plaintiff]" nor "engage[d] in good faith efforts to resolve such concerns within a reasonable period of time" before providing notice of the termination for convenience. *Id.*

On June 6, 2024, Defendant responded to Plaintiff's correspondence through outside counsel and raised a concern about "potential conflicts of interest that [Plaintiff] may have as a result of [Plaintiff]'s support of efforts competitive to Defendant." *Id.* ¶ 43. Plaintiff alleges that there was no potential conflict of interest because Plaintiff was committed to supporting Defendant and the TSA customer throughout its performance of the Subcontract, and Plaintiff repeatedly advised Defendant of that commitment. *Id.*

On June 11, 2024, Plaintiff disputed the sufficiency of Defendant's May 29 and June 3 termination notices and disputed that Plaintiff had any conflict of interest that would violate the Subcontract. *Id.* ¶ 44. Plaintiff also again notified Defendant of the existence of the Employee Non-Solicitation Agreements restricting Plaintiff's personnel who had worked for the TSA customer on the TSA PMSS Project from performing such work at Defendant. *Id.*

Nevertheless, Defendant allegedly persuaded Plaintiff's employees to leave and hired at least 20 of Plaintiff's employees who worked on the TSA PMSS Project to perform work for the

6

same TSA customer and project at Defendant. *Id.* ¶ 45. Plaintiff claims that, between May 29, 2024, and June 20, 2024, Defendant persuaded at least 10 of Plaintiff's employees to leave Plaintiff and accept positions with Defendant to perform work for the TSA customer. *Id.* ¶ 46. By July 3, 2024, an additional 10 employees allegedly left Plaintiff to perform the same work on the TSA PMSS Project for Defendant. *Id.* ¶ 49.

As of June 12, 2024, Defendant had posted approximately twenty-one job positions on its website, listing work experience with either the TSA or DHS as qualifying factors and referencing the same positions held by Plaintiff's departing employees on the Five Task Orders on the TSA PMSS Project. *Id.* ¶ 50. The postings listed the specific qualifications and requirements that directly aligned with Plaintiff's employees on the TSA PMSS Project. *Id.* ¶ 51.

Plaintiff alleges that a number of its employees that worked on the TSA PMSS Project left to work for Defendant:

> For example, Joseph Stallings, a Quality Assurance Specialist for [Plaintiff] on the VAD Subcontract task order, upon information and belief, has accepted the same position posted by [Defendant] supporting the exact same TSA customer. In addition to Joseph Stallings, additional staff members supporting that same TSA customer on the Five Task Orders that were induced by [Defendant] include, among others: Terencia Crump – Quality Assurance Specialist, Thomas Borsander – Training Specialist, Lawrence Wade – Program Analyst, Andrea Estep – Business Process Specialist, Khang Trinh – Project Manager, Michaela Scott – Business Process Analyst, Aushi Biswas – Testing Engineer, Olufemi (Femi) Akinyemi – Business Analyst, Tyana Kennedy – Testing Engineer.

*Id.* ¶ 52.

Plaintiff alleges that Defendant engaged in an unlawful strategy to seize at least 20 of Plaintiff's experienced and TSA-qualified personnel for its own commercial benefit, causing the violation of these individuals' Employee Non-Solicitation Agreements. *Id.* ¶ 53. Plaintiff thus asserts that Defendant "has caused the breach of and tortiously interfered with [Plaintiff]'s Non-Solicitation Agreements with its employees on the TSA PMSS Project." *Id.* ¶ 55. Plaintiff also

asserts that Defendant has been unjustly enriched, alleging that Defendant has derived a substantial benefit from appropriating Plaintiff's "highly-trained and uniquely experienced workforce on the TSA PMSS project for itself." *Id.* ¶ 66.

### B. Procedural Background

On July 10, 2024, Plaintiff filed its Complaint asserting tortious interference with contract and unjust enrichment claims. Dkt. 1. On August 1, 2024, Defendant filed the instant Motion to Dismiss and the accompanying Memorandum in Support. Dkts. 15; 16. Plaintiff filed its Opposition to Defendant's Motion to Dismiss on August 15, 2024. Dkt. 18. Defendant filed its Reply on August 21, 2024. Dkt. 19.

## II. STANDARD OF REVIEW

To survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard is not a probability requirement, but "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). However, "the court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). Nevertheless, courts may consider . . . documents attached to the complaint . . . 'so long as they are integral to the complaint and authentic.'" *Hugler v. Vinoskey*, No. 6:16-cv-00062, 2017 WL 1653725, at *5 (W.D. Va. May 2, 2017) (quoting *Phillips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (explaining that courts "may consider documents . . . attached to the motion to dismiss, as long as they are integral to the complaint and authentic").

III. ANALYSIS

Defendant argues that Plaintiff's Complaint should be dismissed because Plaintiff fails to state claims for tortious interference with contract and unjust enrichment. Dkt. 16 at 6-14. The Court will address each in turn.

A. Tortious Interference with Contract

Count I of the Complaint asserts that Defendant has tortiously interfered with Plaintiff's contractual relationship with Plaintiff's employees. To state a claim for tortious interference with contract under Virginia law, a plaintiff must demonstrate "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of that contractual relationship or business expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Lightfoot v. Richmond Pub. Sch.*, 2017 WL 3476224, at *3 (E.D. Va. Aug. 11, 2017). Despite Defendant's arguments to the contrary, Plaintiff has plausibly stated a tortious interference with contract claim at this stage of the proceedings.

First, Plaintiff has demonstrated the existence of a valid contractual relationship with the employees at issue. The Complaint alleges that the individuals who Plaintiff staffed on the TSA PMSS Project each entered into an Employee Non-Solicitation Agreement with Plaintiff, Dkt. 1 ¶19, providing that each employee

> specifically agrees that during Employee's employment with the Employer and for a period of one year after Employee's employment with the Employer ceases, for whatever reason, the Employee will not, directly or indirectly . . . solicit or provide services to, or sell products to any Business Account of the Company that the Company provided services or products at any time during the six months prior to the termination of Employee's employment.

*Id.* ¶ 21; *see also* Dkt. 1-1 at 3, Art. 2(c). Defendant asserts that the claim should be dismissed because Plaintiff has not identified specific employees whose agreements Defendant allegedly interfered with or alleged that each employee had an identical non-solicitation clause in their respective agreement. Dkt. 16 at 12. But the Complaint names ten employees who were allegedly induced by Defendant to leave Plaintiff for employment with Defendant. *See* Dkt. 1 ¶ 52 (listing ten "staff members supporting the same TSA customer on the Five Task Orders that were induced by" Defendant). Additionally, the Complaint states that the Employee Non-Solicitation Agreement attached to the Complaint is "identical for all [Plaintiff] employees staffed on the TSA PMSS." *Id.* ¶ 20; Dkt. 1-1. At the motion to dismiss stage, these allegations are sufficient to establish the existence of a valid contractual relationship between Plaintiff and each of the identified employees who allegedly left Plaintiff to work for Defendant.

Second, Plaintiff has shown that Defendant had knowledge of Plaintiff's employees' contractual relationship with Plaintiff. The Complaint alleges that Plaintiff informed Defendant of the Employee Non-Solicitation Agreement between Plaintiff and its employees on at least two occasions prior to and during the exodus of Plaintiff's employees to Defendant. *See* Dkt. 1 ¶ 28 (explaining that Plaintiff notified Defendant "on December 2, 2021, through counsel, that

10

[Plaintiff]'s employees working on the TSA PMSS project had restrictive covenants which [Plaintiff] would hold [Defendant] responsible for tortiously interfering with"); *Id.* ¶ 44 (stating that Plaintiff again notified Defendant, "through counsel, on June 11, [2024,] of the existence of the Non-Solicitation Agreements lawfully restricting those [Plaintiff] personnel working for the TSA customer on this TSA PMSS project from performing such TSA customer work at" Defendant). Defendant therefore had knowledge of the contractual relationship between Plaintiff and its employees.

      Third, Plaintiff has adequately alleged that Defendant's intentional interference induced or caused a breach of the contractual relationship between Plaintiff and its employees. "The 'intentional interference' element of the tort does not require that a defendant 'acts for the primary purpose of interfering with the performance of the contract.'" *Glob. Tel\*Link Corp. v. JACS Sols. Inc.*, 708 F. Supp. 3d 784, 802 (E.D. Va. 2023) (quoting *DurretteBradshaw, P.C. v. MRC Consulting, L.C.*, 277 Va. 140, 146 (2009)). "Instead, it is enough if a defendant 'does not act for the purpose of interfering with the contract . . . but knows that the interference is certain or substantially certain to occur as a result.'" *Id.* (quoting *DurretteBradshaw*, 277 Va. at 146). Here, the Complaint alleges that Defendant abruptly provided notice of the termination of the Five Task Orders under which Plaintiff provided services to the TSA customer on May 29, 2024, and June 3, 2024. It further alleges that thereafter Defendant posted job positions on its website listing qualifications for which Plaintiff's employees working the TSA PMSS Project would be most qualified to fill – especially in light of the disappearance of that work following the termination of the Five Task Orders. *Id.* ¶ 50. Defendant then hired those employees despite its knowledge of their Employee Non-Solicitation Agreements. *Id.* ¶¶ 46, 49. Thus, Defendant's termination of the Five Task Orders, followed almost immediately by its creation of positions with Defendant that

11

mirrored the positions at Plaintiff and the hiring of not just one or two, but *twenty* of Plaintiff's employees to perform the same work they performed under the Five Task Orders, sufficiently supports an inference at this stage of the litigation that Defendant tortiously interfered with those employees' contractual relationship with Plaintiff. *See Greater Divide Inc. v. Lippe Taylor Group, LLC*, 2022 WL 18671061, at *4 (E.D. Va. Sept. 26, 2022) (finding that the plaintiff adequately alleged tortious interference with contract where the defendant poached only one employee).

Finally, Plaintiff has suffered damages due to the disruption of its contractual relationships with its employees. The loss of twenty employees with "unique, specialized knowledge and experience," Dkt. 18 at 11, in whom Plaintiff had invested significant time and resources to train, Dkt. 1 ¶¶ 17-18, has harmed Plaintiff's ability to perform for the TSA customer—an agency with whom Plaintiff had an established relationship prior to the TSA PMSS Project, *see id.* ¶¶ 9, 11, 14—and to continue operating in this subject area in the future. *See Greater Divide Inc.*, 2022 WL 18671061, at *4 (finding that the plaintiff adequately alleged "damages in the form of costs associated with finding a replacement for [the poached employee] as well as ongoing damages like lost sales and profits"). Plaintiff has therefore adequately pleaded a claim for tortious interference with contract.

Nonetheless, Defendant contends that Plaintiff's tortious interference claim fails because it sounds in contract rather than tort. Dkt. 16 at 6-10. The Supreme Court of Virginia has acknowledged that "[a] tort action cannot be based solely on a negligent breach of contract." *See Richmond Metro. Auth. v. McDevitt St. Bovis Inc.*, 256 Va. 553, 559 (Va.1998). "To determine whether a cause of action sounds in tort or in contract, the Court must ascertain the source of the duty violated. . . . If the cause of complaint would not give rise to any cause of action absent a contract, then the action is founded upon contract, not tort." *Princeton Woods, L.L.C. v. PNC*

*Bank*, 2009 WL 3614983, at *7 (E.D. Va. Oct. 28, 2009) (internal citations omitted). Additionally, "Virginia courts 'have acknowledged that a party can, in certain circumstances show both a breach of contract and a tortious breach of duty" where the tortiously breached duty is "a common law duty, not one existing between the parties solely by virtue of the contract." *Id.* (quoting *17th Street Assoc's, LLP v. Markel Int'l Ins. Co. Ltd.*, 373 F. Supp. 2d 584, 599 (E.D.Va.2005)).

Defendant argues that Plaintiff's claim of tortious interference with the Employee Non-Solicitation Agreements sounds in contract because the claim "depends on the continued existence of [the] customer relationship between [Plaintiff] and [Defendant] that is defined by the Subcontract; and [Defendant] cannot tortiously interfere with its own contract." Dkt. 16 at 6-7. The Court finds this argument unpersuasive. While it is true that a party cannot interfere with its own contract under Virginia law, that principle does not apply here. The Employee Non-Solicitation Agreements exist separately from the Subcontract between Plaintiff and Defendant. As such, a tortious interference claim is appropriate because Defendant is not a party to the Employee Non-Solicitation Agreements between Plaintiff and its former employees. *See Storey v. Patient First Corp.*, 207 F. Supp. 2d 431, 448 (E.D. Va. 2002) (explaining that a "tortious interference claim requires the existence of three actors – the two parties to the contract and a third-party who interferes with, or induces one of the parties to breach, that contract.").[2] Further, Virginia courts recognize that a breach of "a duty may sound both in contract and in tort . . . where

---

[2] As Plaintiff observes, courts have recognized the validity of tortious interference claims in cases involving a third party interfering with employee restrictive covenant agreements. *See, e.g.*, *DePuy Synthes Sales Inc. v. Jones*, 2014 WL 1165852, *2-5 (E.D. Va. Mar. 21, 2014) (finding that a plaintiff company stated a tortious interference claim against a competitor company for hiring two of the plaintiff's former employees with employment contracts that included non-compete, non-disclosure, and non-solicitation clauses); *Star City Comics & Games, Inc. v. Webbed Sphere, Inc.*, 2010 WL 5186713, at *6-7 (W.D. Va. Dec. 9, 2010) (similar); *CaterCorp., Inc. v. Catering Concepts, Inc.*, 246 Va. 22 (1993) (similar).

13

the [breach] of the contractual duty also violates a common law duty." *Station # 2, LLC v. Lynch,* 280 Va. 166, 171 (2010). Here, Plaintiff alleges tortious interference with the Employee Non-Solicitation Agreements, a claim rooted in "the common law duty to refrain from interfering with another's contractual and business relationships." *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 218 (2014) (explaining that "tortious interference with contract . . . [is an] intentional tort[] predicated on the common law duty to refrain from interfering with another's contractual and business relationships. That duty does not arise from the contract itself but is, instead, a corollary of the contract"). Thus, the Complaint sufficiently alleges a claim that sounds in tort, as it is based on the common law duty to refrain from interfering with another party's contractual relationships. Because the tortious interference with contract claim has been adequately alleged, it can proceed at this stage in the litigation.

Defendant next contends that any common law duty it owed to Plaintiff with respect to tortious interference with Plaintiff's relationship with its employees was modified by Section 31 of the Subcontract and, therefore, should be addressed as a breach of contract claim rather than a tortious interference claim. Dkt. 16 at 10-11; Dkt. 19 at 11-13. Section 31 of the Subcontract prohibits either party from actively recruiting or soliciting employees of the other party without that party's prior written consent but allows a party to hire any person who responds to a public notice of an employment opportunity. Dkt. 10 § 31. Here, the Complaint does not allege solicitation and thus does not assert a breach of contract. It does, however, allege actions taken beyond the mere posting of a job opportunity. In essence Plaintiff's claim is that: (i) Defendant terminated the Five Task Orders; (ii) the termination of the Five Task Orders eliminated the work of Plaintiff's employees; (iii) Defendant posted job listings that directly targeted Plaintiff's employees by listing the specific qualifications and requirements that aligned with those

14

employees who performed work on the Five Task Orders; (iv) Defendant hired twenty of Plaintiff's employees for positions that were only available because Defendant terminated the Five Task Orders despite Defendant's knowledge of the Employee Non-Solicitation Agreements; and (v) those employees left Plaintiff to work for Defendant in breach of the Employee Non-Solicitation Agreements.  The actions alleged here go beyond merely posting public job listings, allowing for an inference of tortious interference with Plaintiff's contractual relationship with its employees.  Plaintiff's claim thus sounds in tort – not contract.

At this stage, accepting as true all of the factual allegations contained in the Complaint and drawing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has adequately stated a claim for tortious interference with contract.  Accordingly, Defendant's Motion to Dismiss will be denied with respect to Count I.

B. Unjust Enrichment

Count II of the Complaint asserts an unjust enrichment claim, alleging that Defendant has derived a substantial benefit from appropriating Plaintiff's "highly-trained and uniquely experienced workforce on the TSA PMSS project for itself." Dkt. 1 ¶ 66.  To state a claim for unjust enrichment under Virginia law, a plaintiff must adequately allege that "(1) [] plaintiff conferred a benefit on [] defendant; (2) [] defendant knew of the benefit and should reasonably have expected to repay [] plaintiff; and (3) [] defendant accepted or retained the benefit without paying for its value." *James G. Davis Constr. Corp. v. FTJ, Inc.*, 298 Va. 582, 597 (2020).

Plaintiff's unjust enrichment claim fails to state a claim.  As an initial matter, Plaintiff's unjust enrichment claim alleges that the benefit Plaintiff conferred was Plaintiff's "workforce." Dkt. 1 ¶ 66.  The Court has a fundamental difficulty finding that people are a benefit that can be conferred for which payment is expected.  Moreover, here, the Complaint does not adequately

15

allege that Plaintiff conferred a benefit on Defendant, as Plaintiff did not give its employees to Defendant. Rather, Plaintiff's employees resigned and went to work for Defendant on their own volition. *Francis v. Nat'l Accrediting Comm'n of Career Arts & Scis., Inc.*, 293 Va. 167, 171-72 (2017) (explaining that "Virginia adheres to the employment at-will doctrine, which allows that '[a]n employee remains at liberty to leave his employment for any reason or for no reason'" (quoting *Johnston v. William E. Wood & Assocs.*, 292 Va. 222, 225-26 (2016))). As courts recognize, "[t]he act of hiring a new employee, . . . does not indicate the employee's former employer has somehow conferred a benefit on the new employer." *Thermal Eng'g Int'l (USA) Inc. v. Hypro, Inc.*, 2023 WL 2634290, at *4 (W.D. Mo. Mar. 24, 2023). "An employee's participation in the labor market generally represents his or her personal decision to seek alternative employment, independent of any action on the part of the former employer, regardless of skills gained during employment." *Id.* Additionally, the Complaint does not allege facts demonstrating that Defendant reasonably expected to pay Plaintiff to hire employees that resigned from Plaintiff on their own volition. *See Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 116 (2008) ("One may not recover under a theory of implied contract simply by showing a benefit to the defendant, without adducing other facts to raise an implication that the defendant promised to pay the plaintiff for such benefit.").[3] Accordingly, Plaintiff has not stated an unjust enrichment

---

[3] The only way Plaintiff could conceivably argue that Defendant would expect to pay Plaintiff for the hiring of Plaintiff's employees was if Defendant solicited Plaintiff's employees, because that would be a breach of contract for which a remedy would be available. But, Plaintiff has not alleged solicitation. Moreover, in Virginia, an unjust enrichment claim is "based on a quasi-contractual theory that is premised on the lack of a contract between the parties." *Run Them Sweet, LLC v. CPA Glob. Ltd.*, 224 F. Supp. 3d 462, 469 (E.D. Va. 2016) (citing *Dr. William E.S. Flory Small Bus. Dev. Ctr., Inc. v. Commonwealth*, 261 Va. 230, 235–37 (2001)). As such, "where . . . a contract exists, there can be no recovery for unjust enrichment." *Id.* (citing *Kern v. Freed Co., Inc.*, 224 Va. 678, 679–81 (1983).

16

claim, and the Court will grant Defendant's Motion to Dismiss with respect to the unjust enrichment claim.

## IV.   CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant's Motion to Dismiss (Dkt. 15) is GRANTED-IN-PART and DENIED-IN-PART.  The Motion is granted with respect to Plaintiff's unjust enrichment claim (Count II) and denied with respect to Plaintiff's tortious interference with contract claim (Count I); and it is

FURTHER ORDERED that Count II of the Complaint is DISMISSED.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to counsel of record.

It is SO ORDERED.

Alexandria, Virginia
March 19, 2025

/s/
Rossie D. Alston, Jr.
United States District Judge